RAWLS, Judge.
The defendant, Florida East Coast Railway, has appealed from a judgment based upon a jury verdict awarding plaintiff) Mrs. Cain, $1,824.00 compensatory damages and $2,000.00 punitive damages for the death of her cows due to arsenic poisoning shortly after the Railway sprayed its right of way with a weed killer.
The physical layout of the 82,000-acre area in question must be gleaned bit by bit from the testimony of all the witnesses. The vastness of the pasture, the fact that it is used by a number of people and the difference in terminology used by the witnesses contribute to confusion in reading the testimony, though it can be assumed that the jury knowing the area was not perplexed. Since the judgment comes to us with a presumption of correctness and we find sufficient evidence to support same, we affirm the award of compensatory damages.
The pasture in question has been in exist-' ence for as long as the residents of the area can remember. It apparently encom *482 passes a part of St. Johns, Putnam and Flagler counties. The Tiltons own most, if not all, of the pasture lands, but there were homes, fenced fields, a dirt road and some 8 or 9 miles of railroad running through the pasture. The uncontradicted testimony of John J. Tilton was that the pasture was completely enclosed, fenced on all sides except for the railroad. The testimony of R. T. Clay, Putnam County Agricultural Agent, corroborated this information. Some years ago the railroad right of way had' been fenced off, but the fence has since been removed. Also, some years ago Mr. Tilton and the Railway entered into what was described on one occasion as a “lease arrangement” and on another as an “agreement” whereby the Railway put in a trestle at milepost 63 and Mr. Tilton agreed to and did tie his fence to the railroad bridge at that point. The purpose of this agreement was to keep the cattle within the pasture. There was testimony to the effect that the grazing cows helped control the weeds on the right of way. The area is generally referred to as the Tilton pasture, but the Cains, .who owned a home within the area, but .no pasture land, and whose 13 cows grazed in the pasture by agreement with Mr. Tilton, referred to' it as. “open range.”
The Cains lived within the pasture and every morning turned their cows out to graze. They had had cows since 1926, had allowed them to graze on the Railway right .of way for many years, and the Railway officials knew of and allowed this practice. On September 20, 1963, the Railway sprayed its right of way with a weed killer. Within two days all of Mrs. Cain’s cows were dead except one which lingered and later died. The veterinarian testified that all the cows he saw appeared to be suffering from the same malady, and from the symptoms he strongly suspected arsenic. One was tested and the laboratory report showed that arsenic poisoning was the cause of death.
The Railway’s chemical engineer, Edmund Fredrick, was in charge of the spray train which carried 6 tank cars of a capacity of 10,000 gallons each. By operating a master valve in the spray car Fredrick could spray either sodium arsenite from one tank car or a less toxic substance, TCA, from another tank car. He testified that in the Tilton pasture he used only TCA (containing no arsenic) from milepost 63 to milepost 70 and sodium arsenite before milepost 63 and after milepost 70. The fenced pasture lands where Mrs. Cain’s cow’s grazed and died were apparently between mileposts 63 and 70. At the speed the train operated when spraying sodium arsenite solution it deposited 3,600 pounds of sodium arsenite in 600 gallons of solution per mile. The expert testimony was that one to four grams of arsenic is a lethal dose, depending on the size of the cow. There are thirty grams per ounce, so an ounce of sodium arsenite could kill on the average of from 7 to 10 cows. The expert testimony was also to the effect that vegetation sprayed with sodium arsenite has an attractiveness to cows.
About 1927, the Railway sprayed its right of way after warning tthe residents to keep their cattle penned for 48 hours. Since that time it has sprayed on other occasions without any warning, but no harm came to the cattle.
The Railway defended primarily on the basis of Chapter 24861, Laws of Florida, Acts of 1947, which in Sections 1 through 12 prohibits the roaming at large of livestock in St. Johns County, provides for the impounding and sale of at large livestock, and makes the intentional or negligent violating owner guilty of a misdemeanor. Section 13 makes the owner liable to the extent of $1,000.00 for damages occasioned by his livestock running at large. Section 13 further provides that livestock running at large is prima facie evidence of negligence of the owner. It is this latter sentence upon which the Railway relies for its theory that Mrs. Cain was guilty of contributory negligence.
We find that the statute has no application here. There was sufficient evi *483 dence from which the jury could have found that the pasture was enclosed, the railroad right of way was part of the pasture by virtue of its acquiescence over a long period of time or by virtue of a lease arrangement or agreement with Tilton, and the Railway negligently deposited in the pasture sodium arsenite which killed Mrs. Cain’s cows.
Punitive damages may be recoverable upon a showing to the jury of malice, wantonness, oppression or outrage. It is this element which we find lacking in the instant case. It is undisputed that the Railway put the spray operations in the hands of a graduate engineer with a bachelor of science degree in chemical engineering. He testified that the rights of way were surveyed and a program for spraying was developed solely on the basis of the type of growth, but due to cattle warnings he changed his program so as to use only TCA chloride on the 7 miles beginning at milepost 63. In the other areas it was the duty of the crewmen to look out for cattle and people and upon sighting either, the spraying operation was switched to a nonlead toxic spray. The crewmen could see the color difference in switching from one chemical to another and this visual checking was one reason for watching, the spray. Mrs. Cain stated that she did not believe the Railway intentionally poisoned her cows. We have failed to find malice or wanton negligence sufficient to sustain punitive damages. The negligence here is not of a gross and flagrant character, evincing a reckless disregard of human life, nor was the negligence so wanton as to demonstrate an entire lack of care which would raise a presumption of conscious indifference to the consequences or that reckless indifference to the rights of others which is in law equivalent to an intentional violation. 9 Fla.Jur., Damages § 122.
Appellant’s other points on appeal have been carefully reviewed and are found to be without merit. We affirm the award of compensatory damages, but reverse that part of the judgment granting punitive damages.
Affirmed in part and reversed in part.
CARROLL, DONALD, K., Acting C. J., and JOHNSON, J., concur.